[Cite as *In re Z.S.*, 2014-Ohio-3748.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE:                                              :

    Z.S., S.S. and M.S.                       :            C.A. CASE NO.    25986

                                     :            T.C. NOS.    JC 2013-3673
                                                                  JC 2013-3674
                                   :                                   JC 2013-3675

                                     :           (Juvenile appeal from
                                               Common Pleas Court)
                                     :

. . . . . . . . . .

**O P I N I O N**

Rendered on the    29th    day of     August    , 2014.

. . . . . . . . . .

MATHIAS H. HECK, JR., by CARLEY J. INGRAM, Atty. Reg. No. 0020084, and TIFFANY ALLEN, Atty. Reg. No. 0089369, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45402
       Attorneys for Appellee

ROBYN A. TRAYWICK, 45 West Franklin Street, Bellbrook, Ohio 45305
       Guardian Ad Litem for the Children

TARA C. DANCING, Atty. Reg. No. 0077277, 1158 Kauffman Avenue, Fairborn, Ohio 45324
       Attorney for Appellant

. . . . . . . . . .

DONOVAN, J.

{¶ 1}     Defendant-appellant S.H. (hereinafter referred to as "Mother") appeals a decision of the Montgomery County Court of Common Pleas, Juvenile Division, adjudicating her three minor sons, S.S., Z.S., and M.S., abused, neglected, and dependent and granting temporary custody and a first extension of temporary custody to Montgomery County Children's Services (hereinafter referred to as "MCCS").   S.H. filed a timely notice of appeal with this Court on October 30, 2013.

{¶ 2}     On July 12, 2012, MCCS received a referral that S.S., seven years old at the time, was a victim of child medical abuse[1], a condition formerly referred to as Munchausen by Proxy Syndrome.   MCCS contacted Dr. Lori Vavul-Roediger and asked her to conduct a case review of S.S. and provide her medical assessment.   Dr. Roediger is the Clinical Director in the Department of Child Advocacy at the Dayton Children's Medical Center (hereinafter referred to as "DCMC").   In order to prepare her assessment, Dr. Roediger obtained S.S.'s medical records from DCMC and Cincinnati Children's Medical Center (hereinafter referred to as "CCMC").   Dr. Roediger also consulted with all of S.S.'s treating physicians.

{¶ 3}     On August 24, 2012, Dr. Roediger issued a case review in which she found

---

[1]"Medical child abuse" is a form of child abuse which occurs as a result of a caretaker providing false or misleading medical information about his or her child to medical providers.  Medical child abuse can occur when a caretaker exaggerates or fabricates information about the child's symptoms.  It can also occur when a caretaker directly causes the child to exhibit certain symptoms, for instance, by having the child ingest a substance that will make him or her nauseous and then claiming the child is suffering from another condition entirely.

that S.S. was the victim of child medical abuse, and his two brothers were at risk. Specifically, Dr. Roediger noted Mother's pattern of misrepresenting and exaggerating S.S.'s symptoms to his various doctors, who then performed several unnecessary and invasive medical procedures on him. When a doctor became unwilling to acquiesce to Mother's demands regarding S.S.'s treatment for fictitious illnesses or conditions, she simply went to another doctor and misrepresented his symptoms in order for him to be treated.

{¶ 4} Dr. Roediger also noted that throughout S.S.'s medical history, Mother's description of his symptoms and various ailments was totally inconsistent with the observations and diagnoses of the doctors and other medical professionals who treated him. While S.S. did in fact suffer from a mildly enlarged aorta, slight renal issues, and small a cyst on his head that was surgically removed, none of these conditions were life threatening, nor did they seriously affect his well-being. Despite the doctors' observations, Mother still maintained that S.S. was suffering from several rare and fatal conditions, even after medical tests proved conclusively that he was generally healthy. Dr. Roediger also reviewed records from the primary care physician who treated the other two boys, Z.S. and M.S., and reported that Mother had engaged in similar conduct with them, though not to the extent that she had with S.S.

{¶ 5} Shortly after Dr. Roediger issued her case review and medical assessment of S.S., all three boys were removed from the parents' home pursuant to an ex parte order on August 27, 2012. One day later on August 28, 2012, a shelter-care hearing regarding MCCS's motions for emergency custody and interim temporary custody was conducted. Mother and M.S. (hereinafter referred to as "Father"), were present at the shelter hearing and

represented by counsel. After hearing testimony from Mother, Father, and Melissa Lowe, a special investigations intake caseworker from MCCS, the magistrate found that probable cause existed for the issuance of the ex parte order removing the three boys from their parents' home. The magistrate also found that the interim custody order would remain with MCCS because she believed that there was a "risk of harm" to the boys if they were placed back with the parents. Neither Mother nor Father objected to the magistrate's decision.

{¶ 6} Throughout the course of the instant proceedings, four sets of complaints have been filed regarding the temporary custody of Z.S., S.S., and M.S. The initial three sets of complaints were dismissed without prejudice when it was clear that a disposition could not be accomplished within the ninety day statutory time frame. When it became evident that the third set of complaints could not be adjudicated within the statutory time frame, the juvenile court ordered that interim custody of the boys would remain with MCCS. The juvenile court also announced its intention to preside over the adjudication and disposition hearing, rather than the magistrate. The fourth set of complaints was filed on May 23, 2013, JC 2013-3673, JC 2013-3674, and JC 2013-3675.

{¶ 7} The adjudication and dispositional hearing was held before the juvenile court on August 12, 2013, through August 26, 2013. Mother "fired"[2] her counsel on the first day of the hearing, claiming that he was not acting in her best interests and was incompetent. At that point in the proceedings, Mother had been represented by five

---

[2] We utilize the term "fired" in quotes because four of Mother's five attorneys were actually appointed by the juvenile court, and Mother was not satisfied with the majority of them, hence the court relieved each of them from further representation.

attorneys, at least three of which she had "fired" claiming incompetence and unprofessional conduct. The juvenile court informed Mother that she could retain private counsel; however, no other attorneys would be appointed to represent her and no further continuances would be granted. Mother ultimately chose to proceed pro se during the adjudicatory and disposition hearing.

{¶ 8} On August 16, 2013, based on the evidence adduced, the juvenile court found that all three boys were abused, neglected, and dependent. The dispositional phase of the hearing concluded on August 22, 2013, and the juvenile court found that it was in the boys' best interest to grant temporary custody and a first extension of temporary custody to MCCS.

{¶ 9} It is from this judgment that Mother now appeals.

{¶ 10} Mother's first assignment of error is as follows:

{¶ 11} "IT WAS ERROR NOT TO RETURN THE CHILDREN HOME AT THE FIRST SHELTER CARE HEARING BECAUSE THERE WAS NOT PROBABLE CAUSE TO BELIEVE THE CHILDREN WOULD BE HARMED."

{¶ 12} In her first assignment, Mother argues that the magistrate erred when she found that probable cause existed for the issuance of the ex parte order removing Z.S., S.S., and M.S. from their parents' home. Mother also argues that the magistrate erred when she found that the interim custody order would remain with MCCS because she believed that there was a "risk of harm" to the boys if they were placed back with the parents.

{¶ 13} Mother, however, failed to object to the magistrate's interim order granting temporary custody to MCCS. Juv.R. 40(D)(3)(b)(iv) provides: "(iv) *Waiver of right to*

*assign adoption by court as error on appeal.* Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Juv.R. 40(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)."

**{¶ 14}** Juv.R. 40(D)(3)(a)(iii) requires a magistrate's decision to include conspicuous language informing the parties of their responsibility to object to, rather than simply appeal, the magistrate's decision. The magistrate's order of interim temporary custody issued on September 4, 2012, specifically states that "[a] party may appeal this order by filing 'Motion to Set Aside Magistrate's Order,' with the Juvenile Clerk of Courts within ten (10) days of the above time-stamped date." The record establishes that Mother did not file any objections to the magistrate's decision, nor did she file a motion to set side the magistrate's order.

**{¶ 15}** More importantly, the magistrate's interim custody order arose from abuse, neglect, and dependency complaints filed in JC 2012-6222, JC 2012-6229, and JC 2012-6226. The juvenile court, however, dismissed those complaints without prejudice in a final appealable order issued on December 5, 2012. The order also contained language wherein the juvenile court adopted the magistrate's decision in its entirety. The order specifically stated as follows:

> The above Magistrate's Decision is hereby adopted as an Order of this
>
> Court. The parties have fourteen (14) days to object to this decision and may
>
> request Findings of Fact and Conclusions of Law pursuant to Juvenile Rule

40(D)(3)(a)(ii) and Montgomery County Juvenile Court Rule 5.11.2. A party shall not assign as error on appeal the Court's adoption of any finding of fact or conclusion of law, in that decision, unless the party timely and specifically objects to that finding or conclusion as required by Juvenile Court Rule 40(D)(3)(b)(iv).

**{¶ 16}** Mother did not file any objections to the magistrate's decision nor did she file a notice of appeal of the juvenile court's order adopting the magistrate's decision and dismissing the abuse, neglect, and dependency complaints (without prejudice to a re-filing) filed in JC 2012-6222, JC 2012-6229, and JC 2012-6226. Because Mother failed to file a notice of appeal of the juvenile court's December 5, 2012 order, we are without jurisdiction to address the issue of whether the magistrate erred when she found that probable cause existed for the issuance of the ex parte order removing Z.S., S.S., and M.S. from their parents' home and granted interim custody of the boys to MCCS.

**{¶ 17}** Mother's first assignment of error is overruled.

**{¶ 18}** Mother's second assignment of error is as follows:

**{¶ 19}** "THE COURT'S FAILURE TO DISMISS THE CASE AFTER THE FOURTH FILING VIOLATED THE OHIO CONSTITUTION, ARTICLE I, SECTION 16."

**{¶ 20}** In her second assignment, Mother contends that the juvenile court erred and violated her due process rights when it refused to dismiss the entire case after the fourth round of complaints was filed.

**{¶ 21}** R.C. 2151.35(B)(1) provides in pertinent part:

*** The dispositional hearing shall not be held more than ninety days after the date on which the complaint in the case was filed.

If the dispositional hearing is not held within the period of time required by this division, the court, on its own motion or the motion of any party or the guardian ad litem [GAL] of the child, shall dismiss the complaint without prejudice.

{¶ 22} The record establishes that the first set of complaints alleging that the boys were abused, dependent, or neglected was filed on August 27, 2012. Once the juvenile court became aware that disposition of the boys' cases could not be accomplished within ninety days of the complaints being filed, the cases were dismissed without prejudice pursuant to the mandatory language in R.C. 2151.35(B)(1). MCCS filed a second set of complaints as is also permitted by R.C. 2151.35(B)(1). As previously noted, four sets of complaints were filed and three were dismissed in the approximately thirteen month period between the ex parte removal of Z.S., S.S., and M.S., and the juvenile court's order granting temporary custody to MCCS. The record establishes that the delays which caused three sets of the complaints to be dismissed were brought on by a combination of factors, including the complexity of the case, the overwhelming volume of medical records to reviewed, and the difficulty of scheduling expert witnesses.

{¶ 23} We note that an agency, such as MCCS, cannot prolong an order of temporary custody indefinitely. Under R.C. 2151.353(F), an order of temporary custody issued under R.C. 2151.353(A) terminates one year after either the date the complaint in the case was filed, or the date upon which the child was first placed into shelter-care, whichever is earlier. The one-year deadline can be extended for two additional periods of six months;

however, if no disposition has been made at the end of the two years, custody of the child or children reverts to the parents. *In re D.J.*, 2d Dist. Montgomery No. 21666, 2006-Ohio-6304.

{¶ 24} Upon review of the record, we conclude that MCCS and the juvenile court complied with the requirements of R.C. 2151.35(B)(1) and did not deny Mother due process of law. There is no evidence that the delays, requiring the dismissal without prejudice and refiling of the charges, were designed to deprive Mother of her due process rights. The language "*shall dismiss \*\*\* without prejudice,*" as used in R.C. 3151.35(B)(1) is mandatory. *In re Brown*, 96 Ohio App.3d 306, 312, 644 N.E.2d 1117 (2d Dist.1994). "[I]t is unthinkable that the welfare and interests of a dependent or abused child may be abandoned with prejudice. The statute [R.C. 2151.35(B)(1)] prevents such a tragedy." *Id.* Accordingly, Mother has failed to establish that the juvenile court violated her right to due process when it dismissed three earlier sets of complaints because it was clear that disposition of the cases could not be accomplished within ninety days, as is required by the mandatory language in R.C. 2151.35(B)(1). The juvenile court simply acted as it was required to under the circumstances.

{¶ 25} We also find that Mother was not prejudiced by the delay in disposition of her boys' custody cases. Specifically, Mother argues that "she lost nine months of time to work towards reunification" with her boys allegedly because of the delay in disposition of their cases. Mother's argument is not supported by the record.

{¶ 26} The initial MCCS caseworker, Heather Booker, testified that as early as September 19, 2012, a case plan had been developed wherein Mother could begin the process of reuniting with her children. Mother refused to comply with any aspect of the

case plan developed by Booker. The next caseworker assigned to the instant case, Vikki Carter, testified that since she received the case in April of 2013, Mother has refused to engage in any services offered by MCCS. In short, Mother has completely failed to perform any of the requirements in her case plan in order to someday be reunited with her children. The delays in disposition of the boys' cases is irrelevant to Mother's refusal to comply with her case plan.

**{¶ 27}** Mother's second assignment of error is overruled.

**{¶ 28}** Mother's third assignment of error is as follows:

**{¶ 29}** "IT WAS A CONSTITUTIONAL AND STATUTORY ERROR NOT TO GRANT A CONTINUANCE AND APPOINT COUNSEL FOR [MOTHER] PRIOR TO TRIAL."

**{¶ 30}** In her third assignment, Mother argues that the juvenile court erred when it refused to appoint new counsel to represent her after she "fired" her appointed counsel, Attorney Slicer, on the eve of the adjudication and dispositional hearing which began August 12, 2013.

**{¶ 31}** Initially, we note that the record indicates that Mother personally requested that Attorney Slicer be appointed to represent her because he was already very knowledgeable about the case. Moreover, prior to Attorney Slicer attempting to negotiate a settlement on her behalf, Mother had informed the juvenile court that Slicer had spent approximately thirty hours with her preparing for the hearing on August 12, 2013. Before the hearing was set to begin, the juvenile court encouraged the parties to negotiate an agreement to settle advanced by MCCS whereby the agency would have dismissed the

allegations of neglect and abuse in exchange for an admission of dependency. The settlement also contained a provision that Father would eventually regain custody of the boys. Father and Mother, while still married, were living separately at this point.

{¶ 32} After permitting her appointed counsel, Attorney Slicer, to negotiate on her behalf for a significant amount of time, Mother provided the juvenile court with a pro se letter, prepared on August 9, 2013, stating that she had discharged Slicer because he had failed to represent her interests competently and that he had violated the Rules of Professional Conduct. The pro se letter also stated that Slicer had spent little time with her in preparation for the hearing, and she had been forced to prepare motions and do research on her own. Before leaving the hearing, Slicer requested that the juvenile court grant Mother a continuance so that she could retain new counsel. The juvenile court denied the request for a continuance and informed Mother that she could retain counsel of her choice to represent her in the adjudicatory hearing, but the court refused to appoint new counsel. Mother asserts that the juvenile court abused its discretion in failing to appoint new counsel to represent her and requiring her to proceed pro se at the hearing.

{¶ 33} Attorney Slicer was the fourth lawyer who had been appointed in this case, and the fifth attorney to represent Mother in total. Immediately after the boys had been removed from the parents' house, Mother and Father retained the legal services of Attorney Dennis Gump. Attorney Gump represented both parents at first and then only Mother when it was found that the parents' legal interests were separate and distinct. Attorney Gump represented Mother until after the shelter-care hearing before the magistrate. Gump informed the magistrate that Mother was essentially indigent and that counsel should be

appointed for her. Gump withdrew from the case, and Attorney Shawn Hooks was appointed to represent Mother on January 18, 2013.

{¶ 34} The record establishes that Attorney Hooks represented Mother until at least February 19, 2013. The record is unclear regarding whether Hooks was "fired" by Mother or chose to withdraw from the case. We note that the record contains an order for extraordinary fees to be paid to Hooks in the amount of $1,100.00 that was issued on April 25, 2013. Nevertheless, the record indicates that Attorney Marcy Vonderwell was appointed to represent Mother on or about February 21, 2013. Immediately before a hearing was to begin on May 28, 2013, Attorney Vonderwell informed the juvenile court that Mother had just "fired" her. Attorney Vonderwell went on to state that communication had broken down between Mother and herself, and she did not believe that she could effectively represent her client at that point. The juvenile court allowed Attorney Vonderwell to withdraw and stated that new counsel would be appointed.

{¶ 35} On May 30, 2013, Attorney Cynthia Westwood was appointed to represent Mother. Less than one week later on June 6, 2013, Attorney Westwood filed a motion to withdraw as Mother's counsel. Attorney Westwood explained to the juvenile court that Mother did not trust her because she once worked for the Montgomery County Prosecutor's Office and had represented MCCS in the past. Westwood stated that she explained to Mother that her past employment would not affect her present representation. Mother disagreed, stating that Attorney Westwood could withdraw, or she would be "fired." The juvenile court allowed Attorney Westwood to withdraw from the case on June 10, 2013. As we have previously discussed, Attorney Slicer, who was ultimately "fired," was the next

counsel appointed to represent Mother.

{¶ 36} Factors to consider in deciding whether a trial court erred in denying a defendant's motion to substitute counsel include "the timeliness of the motion and whether there was a conflict between the attorney and the client that was so great that it resulted in a total lack of communication preventing an adequate defense." *State v. Jones*, 91 Ohio St.3d 335, 342, 744 N.E.2d 1163 (2001), quoting *U.S. v. Jennings*, 83 F.3d 145, 148 (6th Cir.1996). "In addition, courts should 'balanc[e] *** the accused's right to counsel of his choice and the public's interest in the prompt and efficient administration of justice.'" *Id*. at 342-343. The decision of whether to grant a defendant's motion for substitution of counsel is confided to the sound discretion of the trial court. *Wheat v. U.S.*, 486 U.S. 153, 164, 108 S.Ct. 1692, 1700, 100 L.Ed.2d 140, 152 (1988). Additionally, "a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *State v. Harmon*, 4th Dist. Pickaway No. 04CA22, 2005-Ohio-1974, at ¶ 32, quoting *U.S. v. Kryzyske*, 836 F.2d 1013, 1017 (6th Cir.1988).

{¶ 37} Similarly, Mother acknowledges that the grant or denial of a continuance is a matter that is entrusted to the discretion of the trial court. *State v. Goode*, 2d Dist. Montgomery No. 19273, 2003-Ohio-4323, citing *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981). In evaluating a motion for a continuance, a trial court should consider the following: 1) the length of the delay requested; 2) whether other continuances have been requested or received; 3) the inconvenience to the litigants, witnesses, opposing counsel, and the court; 4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; 5) whether defendant contributed to the circumstances which give

rise to the request for a continuance; and 6) other relevant factors, depending on the unique facts of each case. *Unger*, supra, at 67-68.

{¶ 38} As the Supreme Court of Ohio has determined:

"Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. (Internal citation omitted). It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result. *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶ 39} As previously noted, the adjudicatory and dispositional hearing had been delayed several times because of its complexity and the amount of records and witnesses involved. The juvenile court had set the date of the two-week hearing well in advance. Moreover, the juvenile court and five other attorneys had cleared their schedules for approximately two weeks in order to accommodate the length of the hearing. Further, many of the witnesses were doctors and other professionals who had to clear full days of their practice and work schedules in order to testify at the hearing. Another delay in the hearing

date would have greatly inconvenienced all of the individuals involved in the hearing.

{¶ 40} The juvenile court stated the following when it denied Mother's request for new appointed counsel and continuance of the adjudicatory hearing:

The Court: All right. Well – and I guess just before I came out here, mother had filed some paperwork which appears to address the Court, "Dear Judge Kintz." And basically as follows. With regard to all three cases, mom alleges that she has fired Mr. Slicer, and that – that she's forced to represent herself, but she's not capable of representing herself, and that she had to attempt to find her own medical experts, and didn't have the opportunity to spend enough time with her attorney, and on and on, *indicating that she had not been properly served by counsel and that her previous public defenders had all advised her that she couldn't win here, but maybe she could win in the court of appeals*.

\*\*\*

And mom, is that your request at this time?

Mother: Yes, Your Honor.

\*\*\*

The Court: \*\*\* The Court would like to – to continue to have some discussion with counsel in this case. Currently, the Court will deny your request to remove Mr. Slicer. And Mr. Slicer shall remain on the case and will continue to represent you.

(Short Recess Taken)

The Court: All right. For the purposes of the record, all parties initially identified, I think, this morning, are all still present and accounted for. The Court has taken a short recess to maybe try to digest the – what we will call a motion from mom, based on her request to terminate, or indicating that she had already terminated Mr. Slicer's employment, and a request for the Court to appoint new, competent counsel, so that she may have her day in court.

After reviewing the request by mom and the motion, the Court believes that it's unable to force or even ask Mr. Slicer to continue to represent mom in this case, in that there's allegations that could rise to the level of code of conduct issues for counsel; and would not require him to proceed under those circumstances.

***

All right. And the Court recognizes that [Mother]'s request indicates that she certainly did not have enough individual time with counsel. *And we begin today with Mr. Slicer indicating that they had spent thirty hours together, at which time mom agreed yes, we had spent thirty hours together. And it just seems a bit contradictory for the Court to see what's in motion now.*

*The Court would also indicate that there have been, I think, at least four lawyers involved in representation of mom. The last two, and now three, have been virtually terminated by mom, [Mother], for various reasons,*

*all of which were difficult for the Court to understand, not the rationale, but the application to the various attorneys that have been involved. I believe Mr. Slicer would be the third one we've terminated at mom's request.*

Based on that, that Court believes that it is unable to reappoint, or appoint new counsel to represent mom. The Court also believes that mom is still entitled to her day in court. And I would hope that she is able to get counsel to represent her, but she's going to have to do it on her own.

The Court is going to continue the proceedings today and going to rule on what motions we can get through, and we will begin with testimony tomorrow morning.

Mom, I would suggest that if you are able to obtain counsel this evening, they are with you in the morning. You can advise counsel that the Court is not inclined to grant any kind of further continuance because of the circumstances of the children remain in limbo, and that this adjudication must go forward.

*The Court also believes that \*\*\* believes that the actions of [Mother] have been strange, at best, and almost, if not, irrational, over the short time that I have been involved in the case.*

**{¶ 41}** The record establishes that Mother was unable to engage in a good faith effort to work with and assist Attorney Slicer, a lawyer whom she was permitted to select. In her pro se letter, Mother accused Attorney Slicer of serious ethical and professional violations. Mother also stated that she had been unhappy with his representation for a long

time. These allegations were made despite the fact that she had specifically requested Attorney Slicer be appointed to represent her. Additionally, on the day the hearing was set to begin, Mother acknowledged to the juvenile court that Attorney Slicer had spent in excess of thirty hours with her preparing for the adjudicatory hearing. It appears that Mother's last minute decision to discharge Attorney Slicer was deliberately contrived to further delay the hearing. We also note that with the exception of Attorney Gump whom she had privately retained, Mother "fired" at least three of her four appointed attorneys, accusing them of professional misconduct and ethical violations. In light of the foregoing, we find that the juvenile court did not abuse its discretion when it refused to grant a continuance and appoint new counsel for Mother after she had just "fired" her last appointed counsel, Mr. Slicer.

{¶ 42} Mother's third assignment of error is overruled.

{¶ 43} Mother's fourth assignment of error is as follows:

{¶ 44} "IT WAS ERROR FOR THE COURT TO DECLARE DR. VAVUL-ROEDIGER AN EXPERT OVER MOTHER'S OBJECTION WITHOUT FURTHER INQUIRY INTO DR. VAVUL-ROEDIGER'S QUALIFICATIONS."

{¶ 45} In her fourth assignment, Mother contends that the juvenile court erred when it permitted Dr. Roediger to testify, over her objection, as an expert in pediatric medicine and child abuse.

{¶ 46} Under Evid.R. 702, a witness may testify as an expert if "(A)The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the

subject matter of the testimony; and (C) The witness' testimony is based on reliable scientific, technical, or other specialized information."

**{¶ 47}** It is well-established that the expert witness need not be the best witness on the subject. *Alexander v. Mt. Carmel Medical Ctr.*, 56 Ohio St.2d 155, 159, 383 N.E.2d 564 (1978). "The test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search of the truth." *Ishler v. Miller*, 56 Ohio St.2d 447, 453, 384 N.E.2d 296 (1978).

**{¶ 48}** Whether a witness is qualified to testify as an expert is a matter for the court to determine pursuant to Evid.R. 104(A). *Bedard v. Gardner*, 2d Dist Montgomery No. 20430, 2005-Ohio-4196, ¶58. The competency of the proposed expert witness is a matter left to the discretion of the trial court, and the court's ruling will be reversed only for an abuse of discretion. *Alexander*, 56 Ohio St.2d at 157.

**{¶ 49}** In the instant case, the transcript establishes that after the attorney for Father offered to stipulate to Dr. Roediger's qualifications, the juvenile court asked the GAL, the boys' attorney, and Mother if they too would stipulate. The GAL and the boys' attorney agreed to stipulate. According to the transcript, when Mother was asked if she would agree to the stipulation, she responded, "No say, Your Honor." The juvenile court apparently did not perceive Mother's response to constitute an objection and proceeded to find Dr. Roediger to be an expert pursuant to Evid. R. 702.

**{¶ 50}** Even if we were to find that Mother's response did, in fact, constitute a refusal to stipulate to Dr. Roediger's qualifications as an expert in the fields of pediatrics and child abuse, the failure to stipulate cannot be equated with an objection to her testimony.

The record establishes that Dr. Roediger is exceptionally qualified to testify as an expert in the instant case. Dr. Roediger is a pediatrician and child abuse specialist who serves as the medical director for the Department of Child Advocacy at Dayton Children's Hospital. Dr. Roediger's C.V. establishes that she is Board Certified in General Pediatrics and Child Abuse Pediatrics. Dr. Roediger has an extensive educational background and has published articles in several medical journals. We note that her curriculum vitae was admitted without objection from Mother. Certainly, if Mother had actually objected to Dr. Roediger's qualifications as an expert, the objection would have been properly overruled pursuant to Evid. R. 702. See *State v. Hall*, 2d Dist Montgomery No. 25794, 2014-Ohio-2094, ¶ 6 (Dr. Vavul-Roediger is board certified in the fields of general pediatrics and child-abuse pediatrics, has evaluated thousands of children and adolescents for possible sexual abuse or sexual maltreatment, and has testified roughly one hundred times as an expert in general pediatrics and child-abuse pediatrics.)

{¶ 51} Mother's fourth assignment of error is overruled.

{¶ 52} Mother's fifth assignment of error is as follows:

{¶ 53} "IT WAS ERROR TO ADMIT THOUSANDS OF PAGES OF MEDICAL RECORDS IN VIOLATION OF THE CONFRONTATION CLAUSE AND WITHOUT TESTIMONY THAT THE *HYTHA* CRITERIA WERE MET."

{¶ 54} In her fifth assignment, Mother argues that it was error for the juvenile court to admit the medical records from the various doctors and medical professionals who treated Z.S., S.S., and M.S. Specifically, Mother contends that introduction of the records violated her Sixth Amendment right to confront her accusers. Mother also asserts that the medical

records constitute inadmissible hearsay. At the adjudicatory hearing, Dr. Roediger relied on the standard hospital records from Dayton Children's Hospital and Cincinnati Children's Hospital as the basis for her professional opinion that S.S. was the victim of child medical abuse, and the other boys were in danger of harm as well. The juvenile court admitted all of the medical records without objection.

{¶ 55} Generally, the admission or exclusion of evidence is within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created a material prejudice. *In re A.S.,* 183 Ohio App.3d 697, 2009-Ohio-3932, 918 N.E.2d 531, ¶ 53 (12th Dist.). Mother, however, failed to object to the admission of the medical records when they were introduced at the hearing. Therefore, Mother has waived all but plain error in regards to the admission of the medical records. "The plain error doctrine provides for the correction of errors clearly apparent on their face and prejudicial to the complaining party even though the complaining party failed to object to the error at trial." *O'Brien v. O'Brien*, 5th Dist. Delaware No. 2003-CA-F12069, 2004-Ohio-5881, ¶ 19, citing *Reichert v. Ingersoll*, 18 Ohio St.3d 220, 223, 480 N.E.2d 802 (1985). "The plain error doctrine may be utilized in civil cases only with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *Cleveland Elec. Illum. Co. v. Astorhurst Land Co.*, 18 Ohio St.3d 268, 275, 480 N.E.2d 794 (1985).

{¶ 56} Initially, we note that the Sixth Amendment provides, in pertinent part, "in all *criminal* prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." The right of cross-examination is one of the primary interests

secured by the Confrontation Clause. *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). However, proceedings instituted in a juvenile court are civil in nature and not criminal, and it has been held that the Confrontation Clause is inapplicable in abuse, neglect, and dependency proceedings in juvenile court. *In re Burchfield*, 51 Ohio App.3d 148, 154, 555 N.E.2d 325 (12th Dist.1988). Accordingly, Mother had no rights under the Confrontation Clause regarding the medical records.

{¶ 57} Mother also argues that the medical records constituted inadmissible hearsay because the records were not properly authenticated pursuant to the criteria set forth in *Hytha et al. v. Schwendeman*, 40 Ohio App.2d 478, 320 N.E.2d 312 (10th Dist.1974). The *Hytha* criteria are as follows: 1) the record is a systematic entry in the records of a hospital or physician; 2) the diagnosis is the result of well-known and accepted objective practices; 3) the diagnosis is not based on the subjective complaints of the patient; 4) the diagnosis was made by a qualified person; 5) the evidence is competent and relevant; 6) if the record is used to prove the truth of the matter asserted at trial, it must be the product of the party seeking its admission; and 7) the record is properly authenticated. The medical records at issue were created by the doctor or hospital who treated the boys in the ordinary course of business. Moreover, the records were properly authenticated by the individual records custodians, as evidenced by the sworn affidavit attached to each record.

{¶ 58} To be admissible, hospital records must be authenticated. *See Hunt v. Mayfield*, 65 Ohio App.3d 349, 352, 583 N.E.2d 1349 (2d Dist. 1989); Evid.R. 901(A). This may be done either by "call[ing] the custodian, person who made such records, or person under whose supervision they were made, as a witness" or by any such person's

endorsing on the records "the person's verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of the business of the institution." R.C. 2317.422(A). The medical records at issue were created by the doctor or hospital who treated the boys in the ordinary course of business. Moreover, the records were properly authenticated by the individual records custodians, as evidenced by the sworn affidavit attached to each record. Thus, the juvenile court did not err, plainly or otherwise, when it permitted the medical records to be introduced into evidence.

{¶ 59} Mother's fifth assignment is overruled.

{¶ 60} Mother's sixth assignment of error is as follows:

{¶ 61} "IT WAS A DUE PROCESS VIOLATION NOT TO CONTINUE THE AUGUST 16, 2013 HEARING WHEN MOTHER WAS NOT PRESENT BECAUSE OF SEIZURES."

{¶ 62} In her sixth assignment, Mother contends that the juvenile court violated her right to due process when it refused to continue the beginning of the dispositional hearing on August 16, 2013, when she was unable to attend because she was allegedly suffering from seizures.

{¶ 63} "The grant or denial of a continuance is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *In re T.T.*, 2d Dist. Montgomery No. 21658, 2007-Ohio-1736. After the State rested its case in the adjudicatory phase of the hearing, the juvenile court inquired whether any of the parties had any additional witnesses or evidence to present. Mother declined to answer the question

posed by the court and renewed her objection to the entire proceedings. The juvenile court acknowledged her continuing objection and stated that the adjudicatory phase of the hearing was complete. The juvenile court stated that it would announce its decision the following morning on August 16, 2013.

{¶ 64} On August 16, 2013, the juvenile court informed the parties that it had been informed that Mother had purportedly suffered a seizure and would not be attending the hearing that day. Nevertheless, the juvenile court announced its decision which adjudicated Z.S., S.S., and M.S. to be abused, neglected, and dependent. The juvenile court also stated that the dispositional hearing had to begin by August 21, 2013, or the court would be required to dismiss the complaints and start the whole process again. The juvenile court then initiated the dispositional phase of the hearing and permitted the prosecutor to ask the first witness, Heather Booker, less than ten neutral, introductory questions. The exchange between the State and Booker is as follows:

The State: Can you state your name for the record?

Booker: Heather Booker.

Q: Where are you employed?

A: I'm employed at Montgomery County Department of Jobs and Family Services, Children Services Division.

Q: And were you at one time the ongoing caseworker for [Z.S., S.S., and M.S.], the minor children who are the subject to the disposition currently before the Court?

A: I was.

Q: And what period of time were you the ongoing worker?

A: I believe – I was assigned the case [on] September 24th, [2012] and I was transferred off the case [on] March 11th, [2013].

Q: Okay.

A: September 24, 2012, to March 11, 2013.

Q: Okay. And the children – were the children removed prior to you becoming a worker?

A: Yes.

Q: Do you remember when they're [sic] removed?

A: I believe in August.

Q: August of –

A: Of 2012.

Q: And you are probably the only one who doesn't know. We are just going to start disposition today, so I'll ask you briefly. Are the children currently in foster care now?

A: Yes.

Q: Their needs are being met in their current placement?

A: That is my understanding, yes.

The State: And with that, Your Honor, we've begun the disposition, and I believe that we have enough to – I don't know how much you want me to get through. I don't have a lot of current information.

The Court: I think the Court agrees that we have enough testimony

with regard to disposition to say that it has begun and meet the needs of the statutory requirements. And we'll continue the disposition to Monday morning [August 19, 2013] at nine. And fortunately, unfortunately, you get to come back on Monday.

> Booker: Okay. Thank you.

Thereafter, the juvenile court adjourned the proceedings for the weekend. Booker's testimony continued on Monday, August 19, 2013, at which time Mother was present and able to cross-examine her extensively. We note that Mother did not provide any documentation on that date regarding her absence on August 16, 2013.

**{¶ 65}** Upon review, we conclude that the juvenile court did not abuse its discretion when it refused to continue the hearing scheduled for August 16, 2013, despite the fact that Mother was not present. The juvenile court structured its ruling of August 16, 2013, so that they were able to proceed with a full dispositional phase of the hearing with Mother present which afforded her a full opportunity for cross-examination and presentation of witnesses if she selected. Therefore, Mother suffered no prejudice and was able to participate fully in the dispositional phase of the hearing.

**{¶ 66}** Mother's sixth assignment of error is overruled.

**{¶ 67}** Mother's seventh assignment of error is as follows:

**{¶ 68}** "THE COURT VIOLATED MOTHER'S FIFTH AMENDMENT RIGHT NOT TO INCRIMINATE HERSELF BY ORDERING MOTHER TO 'COOPERATE FULLY AND ABIDE BY ALL REQUESTS MADE BY LAW ENFORCEMENT IN ORDER TO COMPLETE THE CRIMINAL INVESTIGATION.'"

{¶ 69} In her seventh assignment, Mother argues that the juvenile court violated her Fifth Amendment right against self-incrimination when it ordered her, as part of her case plan, to "cooperate fully and abide by all requests made by law enforcement in order to fully complete the criminal investigation." We note that the "criminal investigation" mentioned in the case plan refers to the investigation of Mother in connection to allegedly fraudulent fund-raising activities on behalf of S.S.

{¶ 70} Upon review, we find that there is no evidence in the record which establishes that Mother's right against self-incrimination was violated. Significantly, Mother never signed her case plan nor did she cooperate in the criminal investigation regarding the fraudulent fund-raisers. Heather Booker testified that Mother had not completed, or even begun, any work towards her case plan objectives. Detective Isaiah Keller, who was investigating Mother's involvement in the alleged fraud, testified that she would not speak to him or assist in the investigation. Ordering Mother to cooperate in the criminal investigation is not the equivalent of ordering her to relinquish her Fifth Amendment right against self-incrimination. Throughout the pendency of this case, the trial court never compelled Mother to testify against her own interests regarding any fund raising schemes. Instead of seeking relief from the juvenile court's adjudicatory and dispositional orders, the appropriate remedy for Mother would have been to file a motion to modify her case plan pursuant to R.C. 2151.412(F)(2) if she had questioned the breadth of the condition to "cooperate fully with law enforcement."

{¶ 71} Mother's seventh assignment of error is overruled.

{¶ 72} Mother's eighth assignment of error is as follows:

{¶ 73} "THE COURT VIOLATED MOTHER'S DUE PROCESS RIGHTS BY ORDERING HER TO TAKE ACTIONS THAT DO NOT PROMOTE THE WELLBEING [sic] OF HER CHILDREN OR REUNIFICATION WITH THEM."

{¶ 74} In her eighth assignment, Mother argues that three of the requirements in her case plan violate her due process by requiring her "to take actions that do not promote the well-being of her children or reunification with them." Specifically, Mother places at issue the three following conditions: 1) the parents must not take photographs of the boys without permission; 2) Mother must leave her cell phone in the car when she visits the boys at MCCS; and 3) she must sign all releases of information.

{¶ 75} Initially, we note again that Mother did not sign the case plan nor has she taken any actions towards completing the plan. With respect to the conditions requiring Mother to leave her cell phone in the car when she visited the boys at MCCS and the condition that she not take photographs of the boys without permission, the juvenile court had a proper basis upon which to impose the conditions. Testimony was adduced at the adjudicatory hearing that Mother had been taking pictures of the boys while they were outside their foster parents' home. Mother was also found to be following the boys and the foster parents to restaurants and stores. Mother was ordered to not bring her cell phone into MCCS because on multiple occasions she snuck the boys into the bathroom at the agency and took pictures of them without their clothes on. Mother apparently took these photos to document her belief that the boys needed medical attention. The juvenile court ultimately found that S.S. had been medically abused by Mother. The court found that the other two boys had been emotionally abused by Mother. The conditions restricting Mother from

photographing the boys were reasonably put in place to protect them from her irrational conduct. The conditions did not violate her due process rights.

{¶ 76} Lastly, Mother argues that the condition requiring her to "sign all releases" is over broad and does not promote reunification with her children. Mother, however, fails to articulate which releases she does not want to sign. Moreover, Mother does not explain how signing the releases so that necessary information will be made available to MCCS fails to promote reunification or the well-being of the boys.

{¶ 77} Based on the testimony of Heather Booker, a caseworker at MCCS, the agency has been unable to make referrals for a parenting/psychological evaluation or individual counseling for Mother because she had refused to sign the releases. Mother's refusal to sign the releases is a factor preventing reunification with the boys. Because Mother did not sign the release so she could receive the necessary psychological evaluations and counseling, MCCS was denied information it needed to assist the family and move closer towards the goal of reunification. Additionally, the appropriate remedy for Mother would be to file a motion to modify her case plan pursuant to R.C. 2151.412(F)(2), and request some clarification regarding the releases she has thus far refused to sign.

{¶ 78} Mother's eighth assignment of error is overruled.

{¶ 79} Mother's ninth assignment of error is as follows:

{¶ 80} "IT WAS A DUE PROCESS ERROR TO FORECLOSE THE POSSIBILITY OF THE CHILDREN'S REUNIFICATION WITH MOTHER."

{¶ 81} In her ninth assignment, Mother argues that her due process was violated because she was essentially being passed over for reunification with her children even

though she was listed on the case plan. Upon review, the record establishes that Mother has repeatedly refused to comply with the case plan and engage in services designed to address and correct the issues which initially resulted in the boys being removed from the parents' home. Mother argues that MCCS and the juvenile court have ceased to work with her. However, the evidence establishes that both the juvenile court and MCCS have actively promoted reunification with both parents. In fact, the juvenile court stated on the record that MCCS needed to establish a case plan for Mother and Father "that brings reunification of the family to fruition." At the time of the dispositional hearing, testimony was adduced that Father was being closely considered for eventual reunification with the boys, but Mother was informed that until she started working on her case plan, MCCS would not be considering any type of reunification with her. Simply put, it is Mother's refusal to work on her case plan that is preventing reunification with her children.

{¶ 82} Mother's ninth assignment of error is overruled.

{¶ 83} Mother's tenth assignment of error is as follows:

{¶ 84} "MOTHER'S CONSTITUTIONAL RIGHT TO HAVE A FAIR AND IMPARTIAL FACT FINDER WAS VIOLATED BY THE COURT'S BIAS."

{¶ 85} In her tenth assignment, Mother contends that the juvenile court was biased against her in light of several comments made by the magistrate and juvenile court throughout the course of the case.

{¶ 86} "Judicial bias is 'a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of

mind which will be governed by the law and the facts.' Trial judges are 'presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity.'" (Internal citations omitted.) *Weiner v. Kwait,* 2d Dist. Montgomery No. 19289, 2003-Ohio-3409, ¶ 89-90.

{¶ 87} In the first example, Mother points out an exchange where the parties' attorneys were arguing over the difference between "excused" and "unexcused" absences. From a review of the transcript, it is clear that the magistrate was slightly frustrated with the line of questioning and the bickering between the parties' attorneys. The magistrate's concern, however, was how many days each boy missed in total, not whether the absence was excused because Mother had sent a note. Nothing in the exchange between the magistrate and the attorneys establishes bias on the part of the court.

{¶ 88} The next example Mother refers to occurred when Father's attorney requested a continuance but refused to agree to a short extension of the ninety-day time frame when it became apparent that disposition could not be had within the statutory time frame. The magistrate showed surprise that the parties were unwilling to waive the statutory deadline in order to reach a resolution to the case. The magistrate did note that she did not find the parents' conduct and decisions during the proceedings to be objectively reasonable. The record establishes that the magistrate was not exhibiting bias against the parents' attorneys, but rather frustration that neither parent seemed to want to resolve the case and act in the best interests of the children.

{¶ 89} Lastly, Mother asserts that at the fourth shelter hearing, the magistrate was trying to "bully" her into agreeing to interim temporary custody of the boys with MCCS by

interrupting her examination of a witness. The record does not support Mother's allegation. Rather, on May 28, 2013, the juvenile court heard testimony from Vicki Carter, the boys' caseworker from MCCS. Carter testified that based on Mother's failure to make any progress towards her case plan objectives, interim temporary custody should be awarded to MCCS. Mother, who had just fired her third attorney at the beginning of the hearing, cross-examined Carter. Based on Carter's testimony and the already lengthy history of the case, the juvenile court had enough evidence before it to conclude that it was in the best interests of the boys for them to remain in the custody of MCCS.

{¶ 90} Accordingly, we find nothing in the record which establishes that the juvenile court was biased against Mother. The record establishes that the juvenile court made every attempt to accommodate Mother. There was no evidence that the court ever "bullied" her or attempted to exert any undue influence on her in regards to the placement of the boys. The juvenile court's rulings were based on the court's reasonable understanding of the rules of evidence and trial procedure. The juvenile court's adverse rulings during the course of the lengthy proceedings are insufficient to demonstrate any personal animus against Mother.

{¶ 91} Mother's tenth assignment of error is overruled.

{¶ 92} Mother's eleventh and final assignment of error is as follows:

{¶ 93} "MOTHER'S DUE PROCESS RIGHTS WERE VIOLATED DUE TO CUMULATIVE ERRORS COMMITTED THROUGHOUT THE PROCEEDINGS."

{¶ 94} Finally, turning to Mother's cumulative error argument, "separately harmless errors may violate a defendant's right to a fair trial when the errors are considered

together. *State v. Madrigal*, 87 Ohio St.3d 378, 2000-Ohio-448, 721 N.E.2d 52. In order to find 'cumulative error' present, we must first find that multiple errors were committed at trial. *Id*. at 398, 721 N.E.2d 52. We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors. *State v. Thomas*, Clark App. No. 2000-CA-43, 2001-Ohio-1353." *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 33. "Where no individual, prejudicial error has been shown, there can be no cumulative error. *State v. Blankenship* (1995), 102 Ohio App.3d 534, 557, 657 N.E.2d 559." *State v. Jones*, 2d Dist. Montgomery No. 20349, 2005-Ohio-1208, ¶ 66.

{¶ 95} In light of our foregoing analysis, we find that Mother has failed to establish that any errors occurred in the instant case. *State v. Moreland*, 50 Ohio St.3d 58, 69, 552 N.E.2d 894, 905 (1990). Thus, we fail to see how the absence of error can constitute cumulative error. *Id*.

{¶ 96} Mother's eleventh and final assignment of error is overruled.

{¶ 97} All of Mother's assignments of error having been overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . .

HALL, and WELBAUM, JJ., concur.

Copies mailed to:
Mathias H. Heck, Jr.
Carley J. Ingram / Tiffany Allen
Tara C. Dancing
Robyn Traywick
Hon. Nick Kuntz