[Cite as *State v. Cast*, 2022-Ohio-3967.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2021-09-107 |
| | : | O P I N I O N |
| - vs - | | 11/7/2022 |
| | : | |
| BRIAN D. CAST, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. 2020-10-1384

Michael T. Gmoser, Butler County Prosecuting Attorney, and Michael Greer, Assistant Prosecuting Attorney, for appellee.

Jacob D. Long, for appellant.

**S. POWELL, J.**

{¶ 1} Appellant, Brian D. Cast, appeals his conviction in the Butler County Court of Common Pleas after he was found guilty of single counts of aggravated vehicular assault and vehicular assault following a jury trial and sentenced to serve a mandatory 36-month prison term. For the reasons outlined below, we affirm Cast's conviction.

**Facts and Procedural History**

**{¶ 2}** On February 10, 2021, the Butler County Grand Jury returned an indictment charging Cast with one count of third-degree felony aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a) and one count of fourth-degree felony vehicular assault in violation of R.C. 2903.08(A)(2)(b).[1] The matter proceeded to a two-day jury trial held on July 6 and 7, 2021. During trial, the jury was presented with evidence that indicated Cast was operating his motor vehicle well above the posted speed limit while under the influence of alcohol on the evening of August 21, 2020. The jury was also presented with evidence that indicated Cast crossed over the center yellow line while operating his vehicle that evening and struck head-on another driver, D.C., at the intersection of Stahlheber Road and Gene Avenue located in Hanover Township, Butler County, Ohio. There is no dispute that the crash between Cast and D.C. resulted in D.C. suffering serious physical harm to his person that required D.C. to stay in the hospital for two weeks, undergo physical therapy for a period of approximately three months, and be off work for a total of six months.[2] Following deliberations, the jury found Cast guilty of those two offenses as charged.

**{¶ 3}** On August 5, 2021, the trial court held a sentencing hearing. At sentencing, the trial court determined that the third-degree felony aggravated vehicular assault and fourth-degree felony vehicular assault offenses were allied offenses of similar import that would need to merge for purposes of sentencing. Upon the trial court merging the two offenses as allied offenses of similar import, the state elected to proceed with sentencing

---

1. The indictment also charged Cast with one count of fourth-degree felony improperly handling firearms in a motor vehicle and one count of fifth-degree felony improperly handling firearms in a motor vehicle. The state later dismissed the fourth-degree felony charge and the jury found Cast not guilty of the fifth-degree felony charge. This appeal, therefore, deals only with the third-degree felony aggravated vehicular assault and fourth-degree felony vehicular assault charges.

2. D.C.'s nine-year-old son was also in the car at the time of the crash. D.C.'s son, however, was fortunately not injured in the crash.

on the third-degree felony aggravated vehicular assault offense. Following the state's election, the trial court sentenced Cast to serve a mandatory 36-month prison term, less 37 days of jail-time credit. The trial court also notified Cast that he would be subject to an optional postrelease control term of up to three years upon his release from prison. The trial court further ordered Cast to pay restitution to D.C. in the amount of $2,600 and suspended Cast's driver's license for a period of ten years.

{¶ 4} On September 1, 2021, Cast filed a timely notice of appeal. This court issued a scheduling order on September 14, 2021, ordering Cast to file his appellate brief within 20 days of the filing of the complete transcript of proceedings. A notice of the filing of the complete transcript of proceedings was filed with this court on September 24, 2021. Twenty days later, on October 14, 2021, Cast moved this court for an extension of time to file his appellate brief. This court granted Cast's motion and ordered Cast to file his brief on or before November 8, 2021. Cast moved this court for another extension of time to file his appellate brief on November 8, 2021. This court granted Cast's motion and ordered Cast to file his brief on or before November 29, 2021. Cast did not file an appellate brief as ordered by this court, thereby prompting this court to dismiss Cast's appeal. *State v. Cast*, 12th Dist. Butler CA2021-09-107 (Dec. 14, 2021) (Judgment Entry of Dismissal).

{¶ 5} On March 14, 2022, Cast filed an application to reopen his appeal pursuant to App.R. 26(B). To support his application, Cast argued that he received ineffective assistance of appellate counsel when his original appellate counsel failed to file an appellate brief in accordance with this court's scheduling order, thus prompting the appeal being dismissed. App.R. 26(B) allows for a defendant in a criminal case to "apply for reopening of the appeal from the judgment of conviction and sentence, based on a claim of ineffective assistance of appellate counsel." An application for reopening "shall be granted" if there is "a genuine issue as to whether the applicant was deprived of the effective assistance of

counsel on appeal." App.R. 26(B)(5). Ohio appellate courts, including this court, have previously determined that appellate counsel's failure to file a brief resulting in the dismissal of an appeal raises a genuine issue as to whether the appellant was deprived of the effective assistance of appellate counsel. *See, e.g., State v. Howard*, 12th Dist. Warren No. CA83-07-048, 2002-Ohio-3983, ¶ 7 (noting that this court's decision to grant appellant's delayed application for reopening after appellant's appeal was dismissed due to appellant's original appellate counsel's failure to file a brief).

{¶ 6} On May 4, 2022, this court granted Cast's application to reopen the appeal in accordance with App.R. 26(B)(5). *State v. Cast*, 12th Dist. Butler CA2021-09-107 (May 4, 2022) (Judgment Entry Granting Application for Reopening). Two days later, on May 6, 2022, this court issued a revised scheduling order. Pursuant to this court's revised scheduling order, Cast filed an appellate brief on June 1, 2022. The state filed its responsive brief on August 1, 2022 and Cast filed a reply brief on August 15, 2022. Cast's appeal was thereafter submitted to this court for decision on October 5, 2022. Cast's appeal now properly before this court for decision, Cast has raised four assignments of error for review.

**Standard of Review**

{¶ 7} Prior to addressing Cast's assignments of error, we note the well-established principle that "relevant evidence is admissible and irrelevant evidence is inadmissible." *State v. Geddes*, 12th Dist. Fayette No. CA2021-01-001, 2021-Ohio-4115, ¶ 13, citing Evid.R. 402. We also note that "[t]he admission or exclusion of relevant evidence lies within the sound discretion of the trial court." *State v. Moore*, 12th Dist. Warren No. CA2014-10-121, 2015-Ohio-2466, ¶ 28, citing *State v. Robb*, 88 Ohio St.3d 59, 68 (2000). Given the broad discretion afforded to trial courts in deciding evidentiary issues, *State v. Darazim*, 10th Dist. Franklin No. 14AP-203, 2014-Ohio-5304, ¶ 21, an appellate court will not reverse

the trial court's decision to admit relevant evidence absent an abuse of discretion. *State v. White*, 12th Dist. Warren No. CA2018-09-107, 2019-Ohio-4312, ¶ 30. An abuse of discretion connotes more than an error of law or judgment; it implies the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Grindstaff*, 12th Dist. Clermont No. CA2013-09-074, 2014-Ohio-2581, ¶ 21. "[T]he vast majority of cases in which an abuse of discretion is asserted are claims that the decision is unreasonable." *State v. Borts*, 2d Dist. Montgomery No. 23752, 2010-Ohio-4149, ¶ 5. A decision is unreasonable when it is unsupported by a sound reasoning process. *State v. Gearhart*, 12th Dist. Warren No. CA2017-12-168, 2018-Ohio-4180, ¶ 13. We are mindful of this standard when addressing Cast's assignments of error.

**Assignment of Error No. 1:**

{¶ 8} THE TRIAL COURT ERRED BY ADMITTING THE TOXICOLOGY REPORT BECAUSE THE STATE FAILED TO PRESENT EVIDENCE ABOUT THE IDENTITY OF THE LAB AND WHETHER THE BLOOD TEST WAS FORENSIC OR DIAGNOSTIC.

{¶ 9} In his first assignment of error, Cast argues the trial court erred by admitting a toxicology report into evidence that showed he had blood-alcohol level over twice the legal limit approximately one hour after Cast's accident with D.C. To support this claim, Cast argues the trial court erred by admitting the report into evidence because the state failed to lay a proper foundation for the report's admission under either R.C. 4511.19(D)(1)(a) or 4511.19(D)(1)(b). Specifically, Cast argues it was error for the trial court to admit the "mysterious toxicology report" because the record contained "no proof" about whether the report was "produced in a State forensic lab, a private lab, or a hospital lab," thereby rendering the report inadmissible at trial. We disagree.

{¶ 10} Pursuant to R.C. 4511.19(D)(1)(a), in any criminal prosecution for a violation of operating a motor vehicle while under the influence of alcohol in violation of R.C.

4511.19(A)(1)(a), or for an equivalent offense that is vehicle related, such as aggravated vehicular assault in violation of R.C. 2903.08(A)(1)(a) or vehicular assault in violation of R.C. 2903.08(A)(2)(b), the results of a non-forensic, diagnostic blood-alcohol test may be admitted "with expert testimony" to be considered with any other relevant and competent evidence in determining the guilt or innocence of the accused. Thus, for a blood-alcohol test to be admissible pursuant to R.C. 4511.19(D)(1)(a), "the sample must be both withdrawn and analyzed by a health care provider." *State v. Schubert*, 5th Dist. Licking No. 2020 CA 00040, 2021-Ohio-1478, ¶ 11. R.C. 4511.19(D)(1)(b), on the other hand, permits a trial court to admit the results of a forensic, non-diagnostic blood-alcohol test in a criminal prosecution when the person being tested submits to the test at the request of a law enforcement officer under R.C. 4511.191, or where the blood was obtained pursuant to a search warrant, provided that the blood was withdrawn from the accused within three hours of the time of the alleged offense and analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director of health.

{¶ 11} Despite what Cast claims in his appellate brief, the record in this case clearly demonstrates that the toxicology report at issue was generated based upon non-forensic, diagnostic blood-alcohol test conducted by staff at the health care provider where he was taken for treatment following the crash, Fort Hamilton Hospital.[3] The report, in fact, includes the phrase "DIAGNOSTIC RESULTS" directly above a notation indicating the report was generated as a result of "orders placed or performed" while Cast was at Fort Hamilton Hospital for treatment, thus demonstrating the test was not done pursuant to a request of a

---

3. The term "health care provider" is defined by R.C. 2317.02(B)(5)(b) to mean "a hospital, ambulatory care facility, long-term care facility, pharmacy, emergency facility, or health care practitioner." There is no dispute that Fort Hamilton Hospital is a "health care provider" as that term is defined in R.C. 2317.02(B)(5)(b).

law enforcement officer or a search warrant. The report was admitted along with the expert testimony of Robert G. Topmiller, the chief of toxicology at the Hamilton County Coroner's Office located in Cincinnati, Ohio. Topmiller testified that he had reviewed Cast's medical records, including the toxicology report at issue, and noted that the blood-alcohol test performed on Cast's blood was conducted at Fort Hamilton Hospital's laboratory, not a state forensic or other private laboratory. Topmiller also testified that, based on his training and experience, if Cast's blood had been taken to a different laboratory for testing other than the laboratory at Fort Hamilton Hospital that there would have been a note stating as much on Cast's medical records, which there was not. Topmiller further testified that, although he did not have any direct knowledge of what test Fort Hamilton Hospital laboratory used to test Cast's blood, it was likely an enzymatic immunoassay test, a test that, according to Topmiller, is not generally used for "forensic purposes."

{¶ 12} Under these circumstances, we find the state presented sufficient evidence to overcome the foundational requirements necessary for the trial court to admit the challenged toxicology report into evidence under R.C. 4511.19(D)(1)(a). "That statute allows for the admission of blood or urine tested by hospitals, even if such a test does not comply with the Ohio Administrative Code, in certain circumstances where a defendant was transported to the hospital after an accident and underwent a non-forensic, medical blood or urine test." *State v. Abner*, 12th Dist. Warren No. CA2021-05-048, 2021-Ohio-4549, ¶ 21. That is exactly what occurred here and, when faced with a nearly identical factual scenario, what this court previously determined to be the correct application of R.C. 4511.19(D)(1)(a) in these circumstances. *See, e.g., State v. Davenport*, 12th Dist. Fayette No. CA2008-04-011, 2009-Ohio-557, ¶ 17-21 (noting this court's agreement with the trial court's application of R.C. 4511.19[D][1][a] in that case upon finding the results of appellant's non-forensic, diagnostic blood-alcohol test were admissible for purposes of

establishing appellant's aggravated vehicular homicide offense). Therefore, finding no error in the trial court's decision to admit the challenged toxicology report into evidence in accordance with R.C. 4511.19(D)(1)(a), Cast's first assignment of error lacks merit and is overruled.

**Assignment of Error No. 2:**

{¶ 13} THE TRIAL COURT ERRED BY ADMITTING THE HOSPITAL RECORDS, INCLUDING THE TOXICOLOGY REPORT, WHERE NO RECORD CUSTODIAN TESTIFIED THE DOCUMENTS WERE AUTHENTIC AND ADMISSIBLE BUSINESS RECORDS, AND THE R.C. 2317.422(A) CERTIFICATION WAS INVALID.

{¶ 14} In his second assignment of error, Cast argues the trial court erred by admitting the medical records generated by Fort Hamilton Hospital when treating him for the injuries he sustained in the crash that indicated he was suffering from acute alcoholic intoxication after having consumed five or six beers prior to the crash with D.C. To support this claim, Cast argues the medical records were not admissible because they were not properly authenticated under R.C. 2317.422(A), thereby rendering the records inadmissible at trial.[4] We agree. This error, however, was harmless given the other evidence properly admitted into evidence at trial establishing Cast was intoxicated at the time of the crash.

---

4. As set forth within his second assignment of error, Cast also argues the toxicology report discussed above was not admissible because it was not properly authenticated under R.C. 2317.422(A). However, rather than R.C. 2317.422(A), the toxicology report was properly authenticated in accordance with R.C. 2317.422(B). Pursuant to that statute, R.C. 2317.422(A) does not apply to any "certified copy" of the results of any test given to determine the presence or concentration of alcohol at any time relevant to a criminal offense that is submitted in a criminal action or proceeding in accordance with R.C. 2317.02(B)(2)(b). "R.C. 2317.02(B)(2) applies to 'official criminal investigation[s],' where a law enforcement officer requests that a healthcare provider supply the officer with [certified] copies of any tests 'administered to the specified person to determine the presence or concentration of alcohol, a drug of abuse, [or] a combination of them' in the person 'at any time relevant to the criminal offense in question.'" *Skorvanek v. Ohio Dept. of Rehabilitation & Corrections*, 10th Dist. Franklin No. 17AP-222, 2018-Ohio-3870, ¶ 61, citing R.C. 2317.02(B)(2)(a). If the healthcare provider possesses such a record, "in lieu of testifying, 'the custodian of the records may submit a certified copy of the records.'" *Id.*, citing R.C. 2317.02(B)(2)(b). A "certified copy" is "[a] duplicate of an original (usu. official) document, certified as an exact reproduction usu. by the officer responsible for issuing or keeping the original." *Cincinnati Bar Assn. v. Newman*, 124 Ohio St.3d 505, 2010-Ohio-928, ¶ 6, quoting *Black's Law Dictionary* 385 (9th Ed.2009). That is what occurred here. Therefore, as it relates to Cast's argument that the toxicology report was not properly authenticated under R.C. 2317.422(A), such argument lacks merit.

{¶ 15} "To be admissible, hospital records must be authenticated." *State v. Miller*, 2d Dist. Greene No. 09-CA-74, 2012-Ohio-211, ¶ 19. R.C. 2317.422(A) provides a simplified means of authenticating a hospital's records that generally eliminates the need for in-court testimony. *State v. Wyatt*, 12th Dist. Butler No. CA2010-07-171, 2011-Ohio-3427, ¶ 18, citing *State v. Humphries*, 79 Ohio App.3d 589, 595 (12th Dist.1992). Specifically, R.C. 2317.422(A) provides that the records, or copies, or photographs of the records, of a hospital, "in lieu of the testimony in open court of their custodian, person who made them, or person under whose supervision they were made," may be qualified as authentic evidence if "any such person endorses thereon the person's verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of the business of the institution." Therefore, under the plain language found in R.C. 2317.422(A), it is not necessary for the custodian of records, the person who made them, or the person under whose supervision they were made, to appear in open court and testify to the records' authenticity. *Hope v. Shiveley*, 12th Dist. Clermont No. CA2000-04-022, 2000 Ohio App. LEXIS 4006, *4 (Sept. 5, 2000). A hospital's records may instead be accompanied by a verified certification from their custodian, person who made them, or person under whose supervision they were made endorsing and attesting to their authenticity. *In re Z.S.*, 2d Dist. Montgomery No. 25986, 2014-Ohio-3748, ¶ 58.

{¶ 16} Cast initially argues that his medical records were not properly authenticated under R.C. 2317.422(A) because the records were not certified and endorsed as authentic by either the person who made the records or the person under whose supervision the records were made. However, while we agree that Cast's medical records were not certified by the person who made the records or by the person under whose supervision they were made, the record firmly establishes that Cast's medical records were certified by the duly

authorized custodian of the records who had the authority to certify the records. The language found in R.C. 2317.422(A) plainly states that a hospital's medical records may be qualified as authentic evidence if the records were endorsed thereon and certified by the records' custodian in addition to the person who made the records or the person under whose supervision the records were made. *See, e.g., Bohl v. ALCOA, Inc.*, 8th Dist. Cuyahoga No. 108584, 2020-Ohio-2824, ¶ 34 (R.C. 2317.422[A] provides that "a custodian of the records may certify the records as authentic business records. Requiring a certification from the doctor who made the record is unnecessary and would defeat the purpose of R.C. 2317.422[A]"). Therefore, although we agree that Cast's medical records not were not certified by either the person who made the records or the person under whose supervision the records were made, Cast's medical records were nevertheless certified and endorsed as authentic by the records' custodian as permitted by the plain language found in R.C. 2317.422(A). Cast's first argument lacks merit.

{¶ 17} Cast also argues that his medical records were not properly authenticated under R.C. 2317.422(A) because the certification accompanying his medical records was not "verified" given that the records' custodian's signature endorsing and attesting to the records' authenticity was not "sworn to in the presence of an authorized officer." If a hospital's records are properly endorsed and certified by a qualified representative in accordance with 2317.422(A), "no further authentication is needed for them to be admissible." *State v. Roberson*, 6th Dist. Lucas No. L-16-1131, 2017-Ohio-4339, ¶ 97; *State v. Gerth*, 1st Dist. Hamilton No. C-120392, 2014-Ohio-4569, ¶ 16. Beyond authentication, however, R.C. 2317.442(A) "does not make inadmissible evidence admissible." *State v. Johnson*, 2d Dist. Clark No. CA 2361, 1987 Ohio App. LEXIS 10446, *6 (Dec. 30, 1987); *see, e.g. Smith v. Egleston*, 12th Dist. Warren No. CA84-10-068, 1986 Ohio App. LEXIS 7200, *20 (June 16, 1986) ("[w]hile R.C. 2317.422 provides a method

whereby certified copies of hospital records may be placed before the jury, it does not circumvent the authority of the trial court, based on Evid.R. 403, to exclude otherwise relevant evidence where it will confuse the jury or waste their time").

{¶ 18} Pursuant to a plain reading of R.C. 2317.422(A), for a hospital's records to be properly endorsed and certified, thereby satisfying the authentication requirement for admissibility, the certification accompanying the records must be endorsed thereon by the records' custodian, the person who made the records, or the person under whose supervision the records were made, with such person's "verified certification" attesting to the records' authenticity. The phrase "verified certification" is not defined within the Ohio Revised Code. Neither are the separate terms "verified," "verification," "certified," or "certification." "When words are not defined in a statute, they are to be given their plain and ordinary meaning absent a contrary legislative intent." *State v. Jackson*, 12th Dist. Butler No. CA2011-06-096, 2012-Ohio-4219, ¶ 34, citing *State v. Conyers*, 87 Ohio St.3d 246, 249-250 (1999) ("[w]hen engaging in statutory interpretation, courts will give the words in a statute their plain and ordinary meaning absent a contrary legislative intent"). We must therefore look to the common, ordinary meaning of these words to determine what the phrase "verified certification" means in the context of R.C. 2317.422(A).

{¶ 19} The term "verified" means "supported by an affidavit as to the truth of the matters set forth; sworn to." *State ex rel. Clink v. Smith*, 16 Ohio St.2d 1, 2 (1968), citing *Osborn v. Whittier*, 103 Cal. App.2d 609, 230 P.2d 132 (1951); and *Agricultural Bond & Credit Corp. v. Courtenay Farmers Co-op. Assn.*, 64 N.D. 253, 251 N.W. 881 (1933). The term "verification" means a "'formal declaration made in the presence of an authorized officer, such as a notary public, by which one swears to the truth of the statements in the document.'" *Chari v. Vore*, 91 Ohio St.3d 323, 327 (2001), quoting *Black's Law Dictionary* 1556 (7th Ed.1999); *Jordan v. Johnson*, 12th Dist. Madison No. CA2013-03-007, 2013-

Ohio-3679, ¶ 16. "The term 'certify' means '[t]o authenticate or verify in writing' or '[t]o attest as being true or as meeting certain criteria.'" *State ex rel. Orange Twp. Bd. of Trustees. v. Delaware Cty. Bd. of Elections*, 135 Ohio St.3d 162, 2013-Ohio-36, ¶ 37, quoting *Black's Law Dictionary* 258 (9th Ed.2009). The term "certify" also means "to confirm or attest often by a document under hand or seal as being true, meeting a standard, or being as represented." *State ex rel. Stoll v. Logan Cty. Bd. of Elections*, 117 Ohio St.3d 76, 2008-Ohio-333, ¶ 43, quoting *Webster's Third New International Dictionary* 367 (1986). "A certification means that the statement certified is claimed to be true as of the time it is made." *Sinmast of Ohio, Inc. v. Central Trust Co., N.A.,* 1st Dist. Hamilton No. C-790433, 1980 Ohio App. LEXIS 10033, *11 (Dec. 24, 1980). The term "certification" has also been defined to mean "[t]he act of attesting," "[t]he state of having been attested," and "[a]n attested statement." *Black's Law Dictionary* 241 (8th Ed.2004).

{¶ 20} Given the frequent use of the word "attest" or "attesting" when defining the terms "certify" and "certification," the definition "attest" is also relevant. The same is true as it relates to the definition of "attested copy." The term "attest" means "'to certify to the verity of a copy of a public document formally by signature'" and an "attested copy" of a document is "'one which has been examined and compared with the original, with a certificate or memorandum of its correctness, signed by the persons who have examined it.'" *State ex rel. Steele v. Morrissey*, 103 Ohio St.3d 355, 2004-Ohio-4960, ¶ 22, quoting *Black's Law Dictionary* 127-128 (6th Ed.1990). "These definitions are consistent with common usage." *Id.* at ¶ 23, citing *Black's Law Dictionary* 138 (8th Ed.2004) (defining "attest" as "to affirm to be true or genuine; to authenticate by signing as a witness"); and *Webster's Third New International Dictionary* 141 (1986) (defining "attest" as "to witness and authenticate by signing as a witness"). Most of the definitions of "attest," in fact, "require a signature, a statement made under oath, someone witnessing the act, or some official

authentication or verification." (Emphasis deleted.) *Id.* at ¶ 25, citing *Black's Law Dictionary* 138 (8th Ed.2004) (defining "attest" to also mean "to bear witness; testify," "to affirm to be true or genuine," and "to authenticate by signing as a witness"); and *Webster's Third New International Dictionary* 141 (1986) (further defining "attest" to include "to bear witness to," "affirm to be true or genuine," "to witness and authenticate by signing as a witness," "to authenticate officially," "to establish or verify the usage of," "to be or stand as proof of," "to call to witness," and "to put on oath or solemn declaration").

{¶ 21} When considering the various definitions set forth above, it should be no surprise that the Ohio Supreme Court has found the phrase "verified certification" as used in R.C. 2317.422(A) to mean "a sworn, written certification * * *." *State v. Spikes*, 67 Ohio St.2d 405 (1981), paragraph one of the syllabus; *State v. Witt*, 6th Dist. Williams No. WM-04-007, 2005-Ohio-1379, ¶ 34. This requires something more than merely identifying the records as confidential records that had been sent from a hospital's medical records manager. *See State v. Worship*, 12th Dist. Warren No. CA2020-09-055, 2022-Ohio-52, ¶ 15. "A party's attempt to certify the genuineness of medical records by submitting his attorney's affidavit stating that the documents are accurate copies of the originals is [also] insufficient." *Boyd v. Elsamaloty*, 10th Dist. Franklin No. 15AP-533, 2015-Ohio-5578, ¶ 22. The same is true as it relates to a person's own medical records. *See Howard v. Seaway Food Town*, 6th Dist. Lucas No. L-97-1322, 1998 Ohio App. LEXIS 3684, *6 (Aug. 14, 1998) ("appellant stated in an affidavit that the copies of [his] medical records were true and accurate, however, that fact does not render them admissible at trial" under R.C. 2317.422[A]). The certification must instead be set forth within an affidavit endorsed by the records' custodian, the person who made the records, or the person under whose supervision the records were made. *See, e.g., State v. Wooden*, 9th Dist. Summit No. 27250, 2015-Ohio-2633, ¶ 11. Or, at the very least, by having a certification page

accompanying the records that includes a notarized endorsement sworn to by one of the authorized persons explicitly named in the statute. *See, e.g., In re J.T.*, 3d Dist. Wyandot No. 16-10-12, 2011-Ohio-3435, ¶ 28.

{¶ 22} In this case, the certification page accompanying Cast's medical records was not "verified" given that the records' custodian who endorsed the certification and attested to the records' authenticity was not sworn to. The records' custodian's endorsement contained on the certification page was, in fact, not even notarized. Under these circumstances, we find it was error for the trial court to admit Cast's medical records into evidence because the records were not properly authenticated under R.C. 2317.422(A). *See, e.g., State v. Miller*, 2d Dist. Greene No. 09-CA-74, 2012-Ohio-211, ¶ 19 (finding no error in the trial court's decision to exclude victim's medical records from evidence where appellant neither called the records' custodian, person who made such records, or person under whose supervision they were made, as a witness, nor did appellant satisfy the requirements of R.C. 2317.422[A] by having by any such person endorsing on the records "the person's verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of the business of the institution"); *State v. Ellis*, 8th Dist. Cuyahoga No. 91116, 2009-Ohio-852, ¶ 25 (finding no error in the trial court's decision to exclude appellant's medical records from evidence where appellant's medical records did not contain "a written certification and, therefore, they were not admissible under R.C. 2317.422[A]");

{¶ 23} But, as previously noted, although we believe it was error for the trial court to admit Cast's medical records into evidence under R.C. 2317.422(A), such error was harmless given the other evidence establishing Cast's intoxication at the time of the crash. This includes, but is not limited to, the toxicology report discussed above under Cast's first assignment of error that showed Cast had a blood-alcohol level over twice the legal limit

- 14 -

approximately one hour after his accident with D.C. This also includes the testimony and evidence indicating Cast was driving well above the speed limit on the opposite side of the road at the time of the crash. "A finding of harmless error is appropriate where the admission of the evidence was merely cumulative to evidence already presented at trial because it does not result in any prejudice." *State v. Stevens*, 12th Dist. Butler No. CA2015-09-020, 2017-Ohio-498, ¶ 48. The fact that Cast was able to provide several witnesses who testified they did not smell the odor of alcoholic beverage on Cast's person in the time immediately after the crash does not change this fact for it is well established that the jury, as the trier of fact, was free to believe all, part, or none of each witnesses' testimony who appears before it. *State v. Spencer*, 12th Dist. Warren No. CA2018-08-082, 2019-Ohio-2165, ¶ 27. Therefore, because the trial court's error in admitting Cast's medical records under R.C. 2317.422(A) was harmless in that it did not subject Cast to any resulting prejudice, Cast's second assignment of error also lacks merit and is overruled.

**Assignment of Error No. 3:**

{¶ 24} THE TRIAL COURT ERRED BY ADMITTING THE ACM DATA BECAUSE THE DEPUTY THAT OBTAINED IT WAS UNAVAILABLE AND THE TESTIFYING DEPUTY LACKED KNOWLEDGE ABOUT THE PROGRAM USED TO DOWNLOAD THE ACM DATA FROM VEHICLES, IF THE DOWNLOADED ACM DATA WAS ACCURATE, AND WHETHER THE ACM DATA WAS PROPERLY STORED TO PRESERVE ITS ACCURACY.

{¶ 25} In his third assignment of error, Cast argues the trial court erred by admitting into evidence the event recorder data downloaded from both his and D.C.'s airbag control modules ("ACM") that showed how fast their respective vehicles were traveling in half second intervals in each of the five seconds prior to when their vehicles collided (herein

- 15 -

after, "data" or "ACM data").[5] To support this claim, Cast initially argues the trial court erred by admitting this data into evidence because it was a sergeant with the Butler County Sheriff's Office, Sergeant Stephen Poff, and not the Butler County Sheriff's Office deputy who actually downloaded the ACM data to a desktop computer at the Butler County Sheriff's Office, Deputy Nathan Ellcessor, who testified about the data's authenticity at trial.[6] This, according to Cast, violated the authentication requirement set forth under Evid.R. 901(A) because Sergeant Poff "was unfamiliar with the ACM downloading program, and could not say the ACM program's requirements in downloading and storing the ACM data were followed."[7] We disagree.

**{¶ 26}** Pursuant to Evid.R. 901(A), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "This threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity." *State v. Blake*, 12th Dist. Butler No. CA2011-07-130, 2012-Ohio-3124, ¶ 28, citing *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist.1991). "The state instead needs only to demonstrate a 'reasonable likelihood' that the evidence is authentic." *State v. Panzeca*, 12th Dist. Warren No. CA2019-03-023, 2020-Ohio-326, ¶ 26. "Both circumstantial evidence

---

5. A vehicle's ACM, which includes as a subcomponent the "event data recorder," records the vehicle's deceleration and speed based on wheel speed sensors. *State v. Bluhm*, 10th Dist. Franklin No. 15AP-938, 2016-Ohio-7126, ¶ 31. A vehicle's event data recorder has also been referred to more colloquially as the vehicle's "black box," like that which is used to record flight data of an aircraft. *See State v. Wolfe*, 9th Dist. Lorain No. 16CA011027, 2018-Ohio-124, ¶ 19; and *State v. Godfrey*, 3d Dist. Wyandot No. 16-14-03, 2014-Ohio-5392, ¶ 34.

6. Deputy Ellcessor was not available to testify because he was on military leave at the time of trial.

7. The ACM data at issue in this case was downloaded to a desktop computer at the Butler County Sheriff's Office by Deputy Ellcessor using a crash data retrieval program developed by Bosch Diagnostics. The Bosch software takes the raw data from the ACM and generates what is known as a "crash data report." The relevant portions of the two crash data reports generated in this case, which included the speed of the two vehicles, the degree to which the vehicles' accelerators and/or brakes were engaged, and the two vehicle's engines' revolutions per minute, were labeled and admitted into evidence as State's Exhibit 43 and State's Exhibit 44.

- 16 -

and direct evidence may be used to prove the authenticity of evidence." *State v. York*, 12th Dist. Butler No. CA2021-11-147, 2022-Ohio-2457, ¶ 14, citing *State v. Vermillion*, 4th Dist. Athens No. 15CA17, 2016-Ohio-1295, ¶ 14. Evid.R. 901(B) provides examples of the various ways that the authentication requirement set forth under Evid.R. 901(A) may be satisfied. *State v. Carter*, 8th Dist. Cuyahoga No. 104874, 2018-Ohio-2238, ¶ 41. "The most common method is oral testimony that a matter is what it is claimed to be under Evid.R. 901(B)(1)." *State v. Biswa*, 2d Dist. Montgomery No. 29383, 2022-Ohio-3156, ¶ 28.

{¶ 27} After a thorough review of the record, we find no error in the trial court's decision to admit the ACM data into evidence even though it was Sergeant Poff, not Deputy Ellcessor, who testified about the data's authenticity at trial. Sergeant Poff was a supervisor in the Butler County Sheriff's Office's traffic investigation unit who oversaw Deputy Ellcessor activities. This would include, for instance, overseeing Deputy Ellcessor's downloading the ACM data at issue in this case. The record also indicates that, based on Sergeant Poff's testimony, once the ACM data had been downloaded by Deputy Ellcessor that the data could not, and was not, manipulated or changed in any way. The record further indicates that the ACM data, which was kept by the Butler County Sheriff's Office in its regularly conducted activity as a law enforcement agency, was verified by Sergeant Poff to be the same data that the sheriff's office provided to the state. Therefore, while Sergeant Poff was not himself a records custodian with the Butler County Sheriff's Office, Sergeant Poff was certainly a qualified witness who could testify regarding the authenticity of the ACM data being presented by the state at trial. The extent to which Sergeant Poff was purportedly unfamiliar with the program used to download the ACM data, as well as Sergeant Poff's supposed lack of knowledge regarding whether the program's requirements in downloading and storing the ACM data were followed, goes to the weight of the evidence rather than to its admissibility. Cast's first argument lacks merit.

{¶ 28} In reaching this decision, but expressly without rendering any opinion on the matter, we note that the admissibility of event recorder data taken from a vehicle's ACM like what was presented at trial in this case has generally been met with "an overwhelming chorus of approval in jurisdictions across the country, without a single voice raised in dissent." *State v. Byard*, Del. Sup.Ct. No. 1604019011, 2018 Del. Super. Lexis 199, *7 (May 1, 2018); *State v. Diaz*, N.M. App. No. 35,563, 2017 N.M. App. Unpub. LEXIS 53, *10, fn. 2 (noting "that out-of-jurisdiction case law, at least to the extent our limited research has revealed, is unanimous in accepting [crash data report] or [event recorder data] or vehicular 'black box' evidence as scientifically or technologically reliable"). This includes, for example, the Appeals Court of Massachusetts, which found the event recorder data taken from a vehicle's crash recorder was sufficiently reliable to be admissible given the general acceptance of such data in the relevant scientific community. *See Commonwealth v. Zimmermann*, 70 Mass.App. No. 357, 364-365, 2007 Mass. App. LEXIS 1050 (Oct. 3, 2007); *see also Bachman v. GMC*, 332 Ill. App.3d 760, 779-782, 2002 Ill. App. LEXIS 659, *779-*780 (July 29, 2002) (noting that "crash sensors" have been "in production in automobiles for over a decade" and are generally accepted as a tool of accident reconstruction). This also includes the Court of Appeal of Florida, Fourth District, which concluded that the process of recording and downloading event recorder data was not a novel technique or method, and when used as a tool of automotive accident reconstruction, the data has generally been accepted as reliable. *See Matos v. State*, 899 So.2d 403, 407 (Fla.App.2005).

{¶ 29} Cast also argues the trial court erred by admitting the ACM data into evidence because the data constitutes inadmissible hearsay under Evid.R. 802. However, when recently faced with this exact same issue, the Ohio Eighth District Court of Appeals determined that such data is not inadmissible hearsay given that it "does not consist of

'statements' made by a 'person' as contemplated by the Rules of Evidence." *State v. Thompson*, 8th Dist. Cuyahoga No. 109253, 2021-Ohio-376, ¶ 39. In so holding, the Eighth District cited to one of its earlier decisions, wherein it found information generated by computer aided detection ("CAD") in mammography was not inadmissible hearsay. *Gray v. Fairview Gen. Hosp.*, 8th Dist. Cuyahoga No. 82318, 2004-Ohio-1244, ¶ 8-12. In that case, the Eighth District stated:

> [T]he CAD device is not a *person*. The results were not the consequence of a search of database of information created by a person, the accuracy of which would depend upon the accuracy and completeness of the database. * * * Rather, the result was a scientific analysis conducted by a computer which performed a series of complex mathematical calculations based upon detailed information it drew from an x-ray. Therefore, we do not find the computer analysis to be hearsay.

(Emphasis sic.) *Id.* at ¶ 11.

{¶ 30} The Eighth District also cited to another of its prior decisions, wherein it found testimony relating to information a witness received from the Google Maps application on his cell phone was not hearsay. *Dickerson v. Miller's TLC, Inc.*, 8th Dist. Cuyahoga No. 96995, 2012-Ohio-2493, ¶ 12-13. In that case, the Eighth District stated:

> By its very nature, calculation of distance, or of weight, volume, speed, and the like, is impossible without the use of a tool that has been calibrated to show a relevant unit of measure, e.g. a ruler, a tape measure, a wheel, a scale, or, at a more sophisticated level, a radar gun, a breathalyzer, or a blood test. When employed to measure something, none of those tools makes a "statement." * * * Instead, the only "statement" is the testimony of a witness about observations of distance, speed, weight, percentage, or volume he made as a result of using the tool.

(Internal citation omitted.) *Id.* at ¶ 13.

{¶ 31} To further support their decision, the Eighth District then cited to several other cases from around the country setting forth similar holdings. See *State v. Kandutsch*, 336 Wis.2d 478, 507, 2011 WI 78, ¶ 66 (2011) ("a computer-generated report is not hearsay

when it is simply the result of an automated process free from human input or intervention");

*People v. Rodriguez*, 16 Cal.App. 5th 355, 381 (2017) ("[t]he computer-generated report of the GPS data generated by defendant's ankle monitor did not consist of statements of a person as defined by the Evidence Code, and did not constitute hearsay as statutorily defined"); *State v. Stuebe*, 467 P.3d 252, 256, 249 Ariz.127 (2020) ("'machine-produced'" statements "were not made by a 'person' and are not hearsay"); *People v. Hamilton*, 452 P.3d 184, 2019 COA 101, ¶ 24 (Colo.App.2019) ("[r]eports would not be hearsay if a machine generated them automatically * * * because no 'person' or 'declarant' made a communicative 'statement' within the meaning of [Evid.R.] 801"). The Eighth District then concluded by noting that "[t]he historic purpose behind the rule against hearsay is 'to exclude statements of dubious reliability that cannot be tested by cross-examination.'" *Thompson*, 2021-Ohio-376 at ¶ 42, quoting *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 70. Therefore, because "[i]t is axiomatic, at least at this point in time, that a computer cannot be cross-examined," the Eighth District determined that it would continue to "adhere to this well-established principle." *Id.*

{¶ 32} We agree with the Eighth District's decision in *Thompson* and adopt its rationale as if it were our own. Cast's second argument is therefore also without merit. In so holding, we note a recent decision issued by the Court of Appeals of Texas, Fifth District, which also found data taken from a vehicle's ACM does not constitute inadmissible hearsay. *Nguyen v. State*, Tex.App. No. 05-20-00241-CR, 2022 Tex. App. LEXIS 6533 (Aug. 29, 2022). Specifically, as that Texas court found:

> We conclude the crash data report constitutes computer-generated data containing objectively recorded facts. The black box of appellant's vehicle is a computer and, by definition, cannot be a declarant for purposes of the rule against hearsay. * * * Further, to the extent appellant argues that the report constitutes hearsay because it records inputs from the driver, we conclude that such inputs are not "statements" within the

meaning of the hearsay rule. The types of inputs the black box records, such whether the brake or accelerator pedals were depressed or whether the steering wheel was being turned, do not constitute the driver's "oral or written verbal expression, or nonverbal conduct that [the driver] intended as a substitute for verbal expression." Tex. R. Evid. 801(a).

(Internal citation omitted.) *Id.* at *21. We also agree with the rationale expressed by this Texas court. Therefore, for the reasons outlined above, and finding no merit to either of the arguments advanced by Cast herein, Cast's third assignment of error likewise lacks merit and is overruled.

**Assignment of Error No. 4:**

{¶ 33} IT WAS DEFECTIVE PERFORMANCE TO FAIL TO FILE A TIMELY BRIEF AND THERE WAS PREJUDICE BECAUSE THE DIRECT APPEAL WAS DEFAULTED, AND THE MERITORIOUS ASSIGNMENTS OF ERROR WOULD HAVE BEEN SUSTAINED FOR A NEW TRIAL.

{¶ 34} In his fourth assignment of error, Cast argues he was provided with ineffective assistance of appellate counsel when his original appellate counsel failed to file an appellate brief in accordance with this court's initial scheduling order, thus prompting this court to dismiss the appeal. *See State v. Cast*, 12th Dist. Butler CA2021-09-107 (Dec. 14, 2021) (Judgment Entry of Dismissal). However, given this court's decision granting Cast's application to reopen the appeal pursuant to App.R. 26(B)(5), we were, in fact, compelled to find Cast's application for reopening had merit given Cast's original appellate counsel's conduct. *State v. Cast*, 12th Dist. Butler CA2021-09-107, p. 2 (May 4, 2022) (Judgment Entry Granting Application for Reopening) (finding "[c]ounsel's conduct in this case compels us to find that the application for reopening has merit"). Although Cast was originally provided with ineffective assistance of appellate counsel, the granting of Cast's App.R. 27(B) application and the timely filing of an appellate brief by new appellate counsel, any

prejudice resulting from original appellate counsel's failure has been remedied, thereby allowing Cast's appeal to be decided on its merits and rendering this assignment of error moot.

{¶ 35} Judgment affirmed.

M. POWELL, P.J., and HENDRICKSON, J., concur.